# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

In re

CUSTOMS AND TAX ADMINISTRATION
OF THE KINGDOM OF DENMARK
(SKATTEFORVALTNINGEN) TAX
REFUND SCHEME LITIGATION

MASTER DOCKET

18-md-2865 (LAK)

This document relates to:
18-cv-07824; 18-cv-07827; 18-cv-07828;
18-cv-07829; 19-cv-01781; 19-cv-01783;
19-cv-01785; 19-cv-01788; 19-cv-01791;
19-cv-01792; 19-cv-01794; 19-cv-01798;
19-cv-01800; 19-cv-01801; 19-cv-01803;
19-cv-01806; 19-cv-01808; 19-cv-01809;
19-cv-01810; 19-cv-01812; 19-cv-01813;
19-cv-01815; 19-cv-01818; 19-cv-01866;
19-cv-01867; 19-cv-01868; 19-cv-01869;
19-cv-01870; 19-cv-01871; 19-cv-01873;
19-cv-01894; 19-cv-01896; 19-cv-01918;
19-cv-01922; 19-cv-01926; 19-cv-01928;
19-cv-01929; 19-cv-01931; 19-cv-10713;
21-cv-05339.

## DEFENDANTS RICHARD MARKOWITZ AND JOHN VAN MERKENSTEIJN'S OFFER OF PROOF REGARDING ADVICE OF COUNSEL

**TABLE OF CONTENTS**

I.      ADVICE OF COUNSEL – INTRODUCTION ...................................................................1

II.     ADVICE CONCERNING SUBSTANTIVE DANISH LAW. ...............................................5

III.    RELATED U.S. LEGAL ADVICE AND SUPPORT FROM KAYE SCHOLER ...............10

IV.     COMPLETE DISCLOSURE OF MATERIAL FACTS TO LAWYWERS ...........................27

V.      ADVICE CONCERNING PREDECESSOR DIVIDEND ARBITRAGE TRANSACTIONS ....35

        **A.**      The Broadgate Fund ...........................................................................35

        **B.**      Ezra Academy .....................................................................................36

        **C.**      Trading In Belgium ..............................................................................45

## I.    ADVICE OF COUNSEL – INTRODUCTION

1.    By order dated September 6, 2024, this Court ordered the defendants to file "a complete offer of proof (including witness testimony and other evidence) and associated arguments that they propose to introduce at trial pertaining to the presence or involvement of attorneys or to legal advice received of which any defendant claims to have been aware," including "specific documents that defendants anticipate seeking to introduce at trial and detailed representations of anticipated trial testimony."  ECF No. 1172 (Pretrial Order No. 42).

2.    This submission is on behalf of defendants Richard Markowitz and John van Merkensteijn.[1]    Defendants will testify that they sought out, received, and relied upon extensive legal advice that the trading strategy at issue in this case—consistent with previous dividend arbitrage trades in other jurisdictions involving Solo Capital and other non-parties—complied with all applicable law.[2]

3.    Before obtaining the advice described herein, defendants fully and faithfully communicated to their counsel their complete understanding of the transactions. Where defendants relied on formal written advice provided to others, they verified that the advice was based on facts consistent with their own understanding of the transactions.

---

[1] Unless otherwise stated, "defendants," as used in this Offer of Proof, means Richard Markowitz and John van Merkensteijn. Defendants understand that Robert Klugman will be filing a separate offer of proof contemporaneous with this filing.

[2] Defendants informed SKAT of their decision to waive privilege regarding advice pertaining to dividend-arbitrage transactions no later than January 26, 2021.  Stipulation and [Proposed] Order Limiting Waiver Pursuant to Rule 502(d) of the Federal Rules of Evidence (ECF No. 520).  Defendants subsequently produced attorney-client communications and attorney work product to SKAT, and SKAT had a full and fair opportunity to examine the defendants during their 2021 depositions about the involvement of counsel in this matter.  SKAT also deposed four Kaye Scholer attorneys: Peter Wells, Kathleen Wechter, Arthur Woodard, and Michael Ben-Jacob.

4.    The evidence will show that the defendants received advice pertaining to the transactions from no fewer than eight law firms—Arthur Cox, Norton Rose, Freshfields, Hannes Snellman, Horten, Crowell & Moring, Dechert and Kaye Scholer—on topics ranging from beneficial ownership to Danish disclosure law to U.S. securities law.  Defendants will testify that they sought out legal advice because, fundamentally, they wanted to ensure their compliance with all applicable governing law, and because they wanted to understand the specific risks the transactions presented.

5.    The defendants intend to argue that their frequent consultations with counsel, and the information they received from counsel, is probative of their state of mind, their absence of fraudulent intent, their carefulness and lack of negligence, and that the balance of the equities is in their favor.

6.    Below, the defendants set forth certain of the documents and evidence they intend to present at trial.[3]  Most critically, before participating in the Danish dividend arbitrage trades that SKAT contends were improper, the defendants received a formal written  opinion letter from Danish law firm Hannes Snellman to Solo Capital, which described in detail counsel's understanding of the transactions (which matched defendants' understanding) and set forth Danish counsel's unhedged conclusion that in these circumstances the pension plans were the beneficial owners of dividends and entitled to refunds of withheld taxes.   This critical evidence by itself rebuts SKAT's claim that defendants acted with

---

[3] Defendants produced approximately 260,000 pages of material pursuant to their waiver of privilege. Defendants do not purport here to identify each and every document on which they may rely at trial related to legal advice they received, and reserve the right to seek to introduce at trial additional documents and testimony not referenced in this submission.

fraudulent intent or were negligent and shows the balance of the equities is strongly in defendants' favor.

7.    In addition, the defendants also set forth below other important legal advice they received related to the Danish transactions, including confirmation from their US counsel (whom defendants fully briefed on the transactions as defendants understood them) that their pension plans were qualified under U.S. law and that the transactions "worked" from a US tax and pension perspective.  Again, this evidence directly rebuts SKAT's claims for relief.

8.    Defendants also proffer below other evidence related to transactions that predate the Danish transactions.  Before entering into the Danish dividend arbitrage transactions, defendants engaged in earlier dividend arbitrage transactions in Germany and Belgium for which defendants also received extensive legal advice.  These transactions were also conducted largely with Solo and were – as defendants understood it – quite similar in form to the Danish transactions.  Indeed, many of the Belgian transactions were conducted through the same accounts at Solo, by the same pension plans, and pursuant to the same stock lending, trading and custody systems and agreements.  And just as they later did in Denmark, defendants received written opinions from German and Belgian counsel confirming the transactions complied with the law and entitled them to seek withholding tax refunds.   And defendants also received extensive advice from US counsel on these transactions.   This evidence  is highly pertinent to defendants' state of mind and lack of negligence in the Danish transactions for at least two reasons: (1) it helps explain why the defendants were comfortable relying on the advice from Danish

counsel (because it was similar to advice they had received with regard to similar transactions in Belgium and Germany), and (2) it helps explain why the defendants were comfortable with the account, lending, custody and trading agreements used in the Danish transactions (because they had already received advice regarding those agreements with regard to the Belgian transactions).

9.      To be clear, defendants did not know – and therefore did not share with their counsel – that the Solo transactions were circular and that no shares existed.  The documents that SKAT claims show this were discovered by SKAT long after the fact via the execution of a search warrant in Dubai on a company called Elysium, which was not involved in the transaction at issue.  SKAT has yet to offer any evidence that defendants knew that Solo's execution of the trading strategy differed from how it was presented to them by Solo, and how defendants then described it to their lawyers.  In fact, Sanjay Shah himself has testified that he did not share the full story, and specifically did not reveal the circularity of the trading, to defendants.[4]  Defendants do not claim, and will not contend, that they ever received legal advice that they could obtain withholding tax refunds from transactions in which no shares existed.  There is no risk at all for jury confusion on that subject.  Defendants will make perfectly clear that the legal advice described herein goes to their mental state, their lack of negligence, and to the equities, *not* to

---

[4] Shah testified: "[n]o, I didn't explain to them the loop," on May 23, 2024 (Day 19), in connection with SKAT's pending UK litigation.  **Ex. 13** at 15:12 (SKAT_MDL_001_00838250) (excerpting Shah's testimony); *see also id*. at 16:2-9 ("Solo was talking to Argre in the context of providing services to a client. Our conversation was limited to providing those services. The activities beyond their involvement was not of their concern and it was in fact confidential. So it is not normal for a prime broker or a custodian to discuss the business of other clients with each other.").

whether the transactions, if conducted as SKAT contends, complied with Danish law.

## II. <u>ADVICE CONCERNING SUBSTANTIVE DANISH LAW.</u>

10.    This section focuses principally on two key questions of substantive Danish law on which the defendants sought advice: 1) Danish tax law on beneficial ownership; and 2) Danish securities reporting laws.

11.    On June 27, 2012, Arge partner Matthew Stein forwarded Markowitz a formal tax legal opinion letter prepared by leading Danish law firm Hannes Snellman. **Ex. 1** (WH_MDL_00518141).

12.    The opinion, which had been prepared for Solo Capital Partners, explicitly addressed "the Danish tax implications for USPF [a United States Pension Fund] of the contemplated transactions." *Id.* at WH_MDL_00518142.   It described the transaction in great detail, noting (1) the purchase of Danish equities from a regulated inter-dealer broker, (2) taking place prior to the ex-dividend date, (3) settled on or after the dividend record date, (4) the hedge of the long position in Danish equities by the sale of exchange-traded single stock futures, (5) the sale of the equities, (6) the purchase of a futures position to close out the previous futures sale, and (7) the loan of the securities which would minimize financing costs.[5]  *Id.*  The defendants will testify that they understood the trading opportunity Solo presented involving Danish shares to include each of these characteristics, although at different times the hedge involved physically-settled futures or forwards instead of futures.

---

[5] *Cf.* Section V.b., ¶ 115, *infra*, and Exhibit 73 (tracing the life cycle and anticipated cash flows of a Solo-proposed German dividend arbitrage transaction in 2011).

13.  The opinion discussed beneficial ownership at length.  It explained that "the Denmark – US Tax Treaty requires, inter alia, that the US pension fund qualifies as the beneficial owner of the dividend."  *Id.* at WH_MDL_00518145.  It explained, "The concept of beneficial ownership does not exist under Danish domestic law," and recent developments in case law "strongly suggest that the beneficial owner condition found in tax treaties cannot be applied to deny exemption from dividend withholding tax on the ground that the dividend recipient has entered into a derivative transaction over the concerned shares."  *Id.*

14.  It set forth the procedure for obtaining a refund of withheld dividend tax, advised regarding the tax treatment of capital gains on equities, the tax treatment of stock futures transactions, and concluded that the US pension plan "should be regarded as the beneficial owner of the Danish Dividend for the purpose of the Denmark – US Tax Treaty," and "should be entitled to full exemption from Danish withholding tax on the Danish Dividend."  *Id.* at WH_MDL_00518146.  The opinion was signed by two Hannes Snellman partners.  *Id.* at WH_MDL_00518147.

15.  John van Merkensteijn will testify that his Argre colleagues provided him with a copy of the Hannes Snellman opinion, which he reviewed, and that the Argre principals discussed the content of the opinion prior to deciding to participate in Danish dividend arbitrage opportunities.

16.    After reviewing the Hannes Snellman opinion, Markowitz and van Merkensteijn began participating in the Danish dividend arbitrage opportunity that Solo had presented.

17.    To the extent SKAT intends to contend that defendants should have sought additional opinions from Hannes Snellman directed at them in particular, or addressing other issues (e.g., the treatment of "market claims" or "compensation payments"[6]), defendants would offer subsequent opinions prepared by Hannes Snellman at the request of Solo and others, that confirm the advice, and apply it to, among other things, market claims and compensation payments, which tends to rebut any claim by SKAT that defendants' failure to seek additional opinions regarding Danish law caused any injury to SKAT. *See* **Ex. 10** at SKAT_MDL_001_00834555-556; **Ex. 11**.

18.    From the perspective of the defendants, the dividend arbitrage trading in Denmark was lawful and ratified by SKAT's treatment: consistent with Hannes Snellman's opinion, SKAT treated the pension plans as the beneficial owners of the dividends and paid out refunds. Over time, the quantity of shares defendants understood they were purchasing increased. In 2014, defendants sought, received, and followed legal advice on whether the size of their Danish holdings required any disclosure to Danish securities regulators. They wanted

---

[6] A "market claim" or "compensation payment" refers to a payment in lieu of a dividend that might be received if, e.g., there is a failure to deliver shares.

to ensure their compliance with all applicable Danish law, including by making any required disclosures.[7]

19.     On November 24, 2014, Markowitz emailed Kaye Scholer partner Michal Ben-Jacob, copying van Merkensteijn and defendant Robert Klugman ("Klugman"), to ask Kaye Scholer "some questions regarding Danish securities laws." **Ex. 2** at WH_MDL_00439819. In particular, Markowitz wrote, "Specifically, what are the disclosure/reporting requirements for a holder of shares in a public company in Denmark? Is it 5% of outstanding shares (or some other measurement)? (This is what I learned from reading a translation of the Danish Securities Trading Act and other on line summaries.) Is it only the Danish FSA that sets the requirements? Given, that in our cases, a trust is purchasing the shares, is it based on the trustee? The beneficiary? Both? Is there a notion of related parties? Any other specific requirements that we might not be aware of?" *Id.* He continued, "We recognize that you may need to reach out to your securities law colleagues (especially in London) who may then need to speak with a local firm in Denmark that they have a relationship with. But we do want to get these answers as soon as possible." *Id.*

20.     Ben-Jacob forwarded the questions to Claus Bennetsen, Head of Banking & Finance at the Horten law firm in Copenhagen. **Ex. 3**.

21.     On December 2, 2014, Ben-Jacob relayed the (extensive) advice he had received from Mr. Bennetsen. **Ex. 4**; *see also* **Ex. 5** at WH_MDL_00355472

---

[7]     By this point, defendants had been making regular disclosures to the United States Department of Treasury regarding their foreign bank accounts (via FBAR filings) and purchases or sales of Danish securities using Forms S and SLT, in accordance with legal advice they had received from Kaye Scholer. *Infra*, Section III, ¶¶ 72–74; 76–78.

(December 2, 2014 billing entry noting Michael Ben-Jacob had a "call with Danish securities counsel").  Markowitz presented additional questions to Ben-Jacob, who relayed them in another lengthy message to Bennetsen.  **Ex. 6**. Bennetsen provided Ben-Jacob further advice on December 8, 2014, **Ex. 7**, in response to which Ben-Jacob proposed a call to discuss.  **Ex. 8**; *see also* **Ex. 5** at WH_MDL_00355474 (billing entries by Michael Ben-Jacob noting December 10, 2014 "[e]mails with Danish counsel" and a December 12, 2014 "[c]all with Danish Counsel").  Following Ben-Jacob's discussion with Bennetsen, Ben-Jacob summarized his discussion with Markowitz, van Merkensteijn, and Klugman.  **Ex. 9**.

22.    In the course of seeking the Danish lawyer's advice on these issues, Ben-Jacob plainly disclosed the pension plan and partnership structures, as well as the trading patterns in which the plans participated.  **Ex. 6**.

23.    The goal of these late-2014 discussions was to ascertain whether the Plans had to make any disclosures in order to comply with Danish securities laws based on their collective ownership of greater than 5% of outstanding shares of certain Danish issuers.  Via email on December 12, 2014, Ben-Jacob communicated to Markowitz, van Merkensteijn, and Klugman an overview of Danish counsel's advice and stated that "my own conclusion would be not to file" a report with the Danish securities regulators relating to the Plans' aggregate ownership positions.  **Ex. 9** at WH_MDL_00317341.  The Plans heeded this advice, which was consistent with the analysis of Danish counsel.  Defendants proffer this evidence because it tends to show their good faith belief that real trading was

occurring (else there would be no reason to consider whether disclosure was required), which tends to rebut SKAT's fraud claim, and to show the carefulness with which they considered all issues relevant to these transactions, which is inconsistent with SKAT's negligence allegations.

### III.    RELATED U.S. LEGAL ADVICE AND SUPPORT FROM KAYE SCHOLER

24.    In connection with this fundamentally international investment strategy, the individual defendants also sought corresponding advice on a wide range of U.S. law issues integral to their participation in Danish dividend arbitrage trading. For example, the individual defendants sought Kaye Scholer's advice and assistance on matters ranging from the structure of U.S. pension funds and the partnership arrangements entered into by those plans, compliance with U.S. tax, pension, and securities regulatory regimes, as well as review and advice on the voluminous contractual agreements between the trading plans and the various third-party brokers, custodians, and advisors who played a role in executing the strategy.  In connection with advice related to dividend arbitrage transactions and related matters, Kaye Scholer billed approximately $2.2 million.

25.    Beyond legal advice, the individual defendants also enlisted Kaye Scholer to support the execution and administration of Danish trading strategy by, *inter alia*, appointing Kaye Scholer attorneys to serve as authorized representatives of the plans who then signed beneficial owner declarations submitted to reclaim agents.  At times, Kaye Scholer was also tasked with coordinating the establishment of the individual pension plan entities, and then completing the onboarding process at the various custodians and third-party brokers prior to trading.

26.    As a matter of U.S. tax and pension law, Ben-Jacob expressed his view on multiple occasions that he and others at Kaye Scholer believed the transactions "worked." **Ex. 102** at 268:9–269:23; *see also* **Ex. 12** at WH_MDL_00296098 (telling Markowitz "we still think the transactions work" via email dated 09/04/2013).

*Advice Concerning Pension Plans – Qualification, Prohibited Transactions, etc.*

27.    Kaye Scholer provided extensive advice to the defendants concerning the use of U.S. pension plans in connection with the ex-dividend strategy. As described in more detail below, this advice covered topics related to the legal qualifications of the plans, detailed advice on compliance with applicable U.S. pension scheme regulations (including prohibited transaction rules), plan governance and funding, and review of the underlying transactional documents.

28.    Arthur Woodard was a partner at Kaye Scholer with expertise in employee benefits and ERISA, retirement plans, and 401(k) issues, who worked with Ben-Jacob on Argre's dividend arbitrage strategy. **Ex. 145** at 15, 17–19, 53, 60.

29.    Defendants expect that Woodard would testify that some plans—"perhaps all of them"—"had entered into a volume submitter arrangement, which, by definition, means that the plans are qualified. I have an opinion letter from the IRS that they're qualified." *Id.* at 53.

30.    Kaye Scholer liaised with Elite Pension Consultants to establish the 2014 trading plans, and knew of legal limitations on contributions. *See* **Ex. 26**.

31.    Kaye Scholer identified Elite as an alternate service provider to Broad Financial, whose services Markowitz will testify were previously used in connection with the establishment of the Argre-era trading pension plans.

32.    Defendants expect that Woodard would testify that he recalls spending a substantial amount of time on issues related to the qualification status of the Plans and to prohibited transaction rules—meaning, whether the pension plans complied with a set of applicable U.S. regulations.  "I can say that, to my recollection, the greatest amount of time . . . involved prohibited transactions and potential excise taxes under prohibited transactions that could apply to one or more entities and/or individuals in this transaction."  **Ex. 145** at 64:4–9.  Neither Woodard nor Kaye Scholer advised the defendants that their plans ran afoul of the prohibited transaction rules.

33.    Kathleen Wechter was of counsel at Kaye Scholer and worked in the area of employee benefits and executive compensation. **Ex. 147** at 15.  Wechter advised van Merkensteijn, Markowitz, and the Argre partners on issues related to pension and retirement plans.  *Id.* at 23.

34.    A memorandum dated December 12, 2012, authored by Woodard (the "December 12, 2012 Kaye Scholer Memo"), "memorialize[d] the substance of [Kaye Scholer's] discussions with Argre regarding the proposed investments by a 401(k) plan (the 'Plan') in certain transactions involving the purchase and sale of foreign securities (an outline of the facts as provided in discussion with Argre is set forth in a draft memorandum attached hereto)." **Ex. 25** at WH_MDL_00342578 (footnote omitted).

35.    The December 12, 2012 Kaye Scholer Memo primarily addressed whether the U.S. Department of Labor ("DOL") would view various component parts of the ex-dividend transaction as "prohibited transactions" under Internal Revenue Code § 4975.  *Id*.

36.    One of the issues addressed in the December 12, 2012 Kaye Scholer Memo is "whether the compensation to be received by Solo is 'reasonable' so as to be exempt from the prohibited transaction rules[.]"  *Id.*  In advising on the risks of such a finding, Kaye Scholer understood "that Solo initially will receive approximately 65% of the gross gain in the transaction, but that, after payment of expenses, to other unrelated parties, its net share will be approximately 25% of the gross gain (or more than 40% of the net gain)."  *Id.* at WH_MDL_00342579.  Although Kaye Scholer outlined the parameters of the reasonableness issue and identified a risk that DOL could make an argument to challenge reasonableness that would carry the possibility of penalties, it did not advise Argre that the 65% fee to Solo was unreasonable.

37.    The December 12, 2012 Kaye Scholer Memo also discussed "whether Argre is a 'service provider' to the Plan and, if so, whether the compensation it is to receive is 'reasonable' so as to also be exempt[.]"  *Id*. at WH_MDL_00342578– 79.

38.    Finally, the December 12, 2012 Kaye Scholer Memo discussed "whether the lending of securities in the transactions complies with Prohibited Transaction Exemption 2006-16 which exempts the lending of securities by a plan from

most of the prohibited transactions requirements if certain conditions are satisfied." *Id*. at WH_MDL_00342579.

39.    With respect to the plans trading in Denmark in 2012 through early 2014, Kaye Scholer advised that powers of attorney be "in place for all of the pension plans" authorizing [Argre employee] Adam LaRosa to take "ministerial actions in connection with executing trade orders and sign[] reclaim forms and related matters – all in accordance with the directions of the principal." **Ex. 27** at WH_MDL_00217727.   Kaye Scholer drafted the powers of attorney in accordance with this advice. *See id.*

40.    Kaye Scholer recommended that the Plans formed in 2014 utilize an "authorized trader" in order to avoid potential prohibited transactions. **Ex. 102** at 399:11–402:13; **Ex. 29**.

41.    On August 2, 2013, Markowitz and van Merkensteijn received from Kaye Scholer attorney Peter Wells a "revised memo" (the "August 2, 2013 Kaye Scholer Memo") "reducing to writing . . . our advice related to the ex-dividend trades." **Ex. 28** at WH_MDL_0223634.   The August 2, 2013 Kaye Scholer Memo lists the following questions under the heading "Tax Related" and sub-heading "Pension Structures": "Does the plan qualify for the tax exemption under the applicable treaty under the definition of a 'pension' within the meaning of the treaty?"; "Does the transaction create FBAR reporting requirements for any of the individuals/entities involved?  Does it give rise to a requirement to file other tax related forms with respect to the transaction?" *Id.* at WH_MDL_00223636.

42.     A June 20, 2014 Kaye Scholer memorandum addressed to the Argre group, regarding "Michelle Investments: Pension Plan Trades: Transactions with 'Disqualified Persons'" (the "Michelle Memo"), "provides an analysis of certain issues related to transactions with 'disqualified persons' under the Internal Revenue Code of 1986 (the 'Code')." **Ex. 74** at JHVM_0010573.

43.     The Michelle Memo states that the "Michelle Plan is subject to Section 4975 of the Code but should not be subject to ERISA since, as we understand, it does not cover employees and only covers the Members. Based on the facts above and the discussion below, we conclude that an argument can be made that the 'service provider exemption' should apply to these transactions as described herein. In order to prevail in such an argument, one would have to prove, as discussed below, that the fees paid by the Michelle Plan were reasonable fees." *Id.* at JHVM_0010578.

44.     In discussing whether the fees paid by the Michelle Plan were reasonable fees, the Michelle Memo states: "Given the size of the payments to Solo in this matter, we would expect the DOL [U.S. Department of Labor] to closely scrutinize the fee by looking at the fees charged for similar services, if any, as well as the time and effort expended by Solo. We would also expect that the DOL would look at how much of the amount is actually compensation to Solo and how much is payment to third party providers, and to what extent the payment to third party providers is reasonable compensation. In this regard, we understand that Solo and other unrelated providers have and do provide similar arrangements to other investors (both plans and non-plan investors) under

- 15 -

arrangements in which the investors share of the net proceeds is as low as 10%. We also understand from you that the trustees of the Michelle Plan were not able to find a provider which would provide similar investment services at a lower cost. This indicates that the amounts paid to Solo are consistent with or less than those charged other investors. In addition, many hedge fund managers charge a fee of 20% or more of profits (we understand that some managers charge a fee of up to 50% of profits), which indicates that market demands often result in arrangements for fees which appear large but which are deemed by investors as appropriate to attempt to obtain a desired return." *Id.* at JHVM_0010582-83. (footnotes omitted).

45.    The defendants will testify that they also relied on lawyers to review and advise on all of the underlying transaction documents (not only those that might relate to dividend arbitrage), and that they expected the lawyers to make sure that all of the documents protected defendants' interests and were in line with market terms. Among the numerous transactional documents on which Kaye Scholer advised were:

a.    Client custody agreements, *e.g.*, **Ex. 18** (reflecting April 2012 Kaye Scholer comments on draft provided by Solo);

b.    Notice of Classification Letter, *id.* (same);

c.    Give Up Agreement, *id.* (same);

d.    Guarantee Deed, *id.* (same);

e.    Beneficial Owner Declaration Forms, *id.* (same);

f. Anti-Money Laundering and Patriot Act compliance, *e.g.*, **Ex. 135** (reflecting Kaye Scholer advice on tax and compliance issues in connection with payments under the Tax Reclaim Services Advisory Agreement with Ganymede and attaching sample certification form);

g. Stock lending agreements*, e.g.,* **Ex. 14** (April 18, 2012 email from Markowitz to Kaye Scholer attaching a stock lending agreement and requesting Kaye Scholer review); and

h. Forward contracts, *e.g.*, **Exs. 141, 142** (reflecting sample forward contract reviewed by Kaye Scholer).

46.  In 2014, when Solo started white labeling its custody services through other firms, including Old Park Lane, Kaye Scholer reviewed the updated custody agreements between the Plans and custodians, and similarly reviewed the Octave trading software license agreement the plans entered into. *See* **Ex. 19**.

47.  Markowitz will testify that Kaye Scholer assisted with the securities lending leg of the transactions by reviewing the master securities lending agreements, providing advice, and helping to negotiate the final terms of those agreements.

48.  Markowitz will testify that Kaye Scholer assisted with respect to the tax reclaim agreements by reviewing the documentation and providing advice.

*Kaye Scholer's Administrative Support of 2014 Trading Plans*

49.  The defendants will also testify that, ancillary to the legal advice, Kaye Scholer provided substantial administrative support in connection with the Danish ex-dividend transactions, and were reasonably understood to possess full knowledge of how the investment worked. The defendants will also testify

about their belief that Kaye Scholer would not have performed these administrative tasks if they otherwise had concerns about the propriety of the transaction at any level. For example, Kaye Scholer generally used its mailing address for the 30 new Plans and undertook receiving, reviewing, sorting, and forwarding any incoming mail to the Plans.  **Ex. 102** at 218:7–25; **Ex. 146** at 98–101; *see* **Ex. 33**.

50.     Kaye Scholer assigned Plans to various reclaim agents, subject to confirmation by Solo.  *See* **Ex. 34**.

51.     John van Merkensteijn executed a Power of Attorney appointing Michael Ben-Jacob as Mr. van Merkensteijn's attorney-in-fact and agent ("Power of Attorney").  **Ex. 35**.

52.     That Power of Attorney authorized Michael Ben-Jacob to, among other things, "[e]xecute . . . any and all documentation related to . . . or reasonably necessary to implement" Mr. van Merkensteijn's participation in the dividend arbitrage opportunity with Solo Capital Limited, Solo Capital Partners LLP, and Old Park Lane Capital PLC, including executing "any and all documents and forms related to the organization and establishment" of LLCs and pension plans, "any and all forms and documents . . . necessary to establish bank, investment, security, and/or custody accounts," and "any and all forward sales contracts, security lending agreements, guarantee deeds, custody agreements, tax reclaim agreements and any such other related documents[.]"  **Ex. 35** at MBJ_0005101.

53.     Peter Wells signed Michael Ben-Jacob's name to beneficial ownership declaration forms submitted to reclaim agents on the Plans' behalf. *See* **Ex. 102** at 192:2–193:3, 201:1–17; **Exs. 37**, **38**.

54.     The defendants will testify that, at times, Kaye Scholer assisted with the onboarding of the Plans with the various custodians and brokers. Markowitz will testify that Kaye Scholer worked with the legal and compliance teams at Old Park Lane or Solo, reviewed documents on defendants' behalf, and, in some points, filled out documents for our review to complete the documentation process. *See also* **Exs. 148–149** (demonstrating Kaye Scholer's submission of onboarding documents to a broker, Ballygate Capital Limited, on behalf of the Avanix plan); **Ex. 136** (reflecting Kaye Scholer's assistance liaising with Solo on AML issues in connection with onboarding).

55.     Defendants will testify that Kaye Scholer received and reviewed the documentation, and advised defendants, if necessary, on the terms of the forward sale contracts entered into by the Plans.

*Advice Concerning Partnership Structures*

56.     Defendants will testify that Kaye Scholer advised them on the partnerships in which the Plans participated, including drafting partnership agreements reflecting that any profits from dividend arbitrage trading (including Danish trading) would be shared with five percent going to the trading pension plan, and 95 percent to the other pension plan partners. *See also* **Ex. 102** at 126, 128.

- 19 -

57.    Kaye Scholer advised that a five percent interest was the minimum ownership interest required as a matter of U.S. law in order for the Plan to beneficially own the partnership's income.  **Ex. 102** at 128:7–132:14.

58.    In a November 19, 2012 email, Peter Wells writes to Richard Markowitz (while copying Jerome Lhote, John van Merkensteijn, Matthew Stein, Adam LaRosa, and Ben-Jacob) to "note some of the open points . . . that we are working on related to . . . the Solo transaction."  **Ex. 20** at WH_MDL_00219798.

59.    The November 19, 2012 email highlights a range of critical issues on which defendants were then consulting Kaye Scholer in order to ensure legal compliance with their participation in the transaction. Specifically, Wells lists the following "[i]ssues that we are looking into and related point" under the heading "Solo Transaction": (1) "How the mechanics of funding of the general partnership will work given that the Pension Plan did not initially put capital into the partnership"; (2) "What is the lowest percentage that the Pension Plan can contribute to the general partnership so that the partnership is respected for regulatory purposes"; (3) "Whether the Pension Plan can represent that it is the beneficial owner of the tax reclaims given the general partnership structure"; (4) "we will draft the general partnership agreement based on the determination as to the ultimate financial arrangement between the partners (taking into account the answer to number 2 above) [and] include a provision that appoints Adam as the administrative agent of the partnership"; and, (5) "Whether Argre (or a related entity) could potentially be considered to be offering a security

both as to the original iteration of the transaction, as well as the new partnership structure." *Id.* at WH_MDL_00219799.

60. On June 12, 2015, Peter Wells sent Michael Ben-Jacob an email in which Mr. Wells proposed a resolution to a question raised by the clients about repatriating trading proceeds in a legally compliant manner. **Ex. 30**.

61. Kaye Scholer advised that the partnerships remain in existence after dividend arbitrage trading ceased. **Ex. 102** at 144:2–12; **Ex. 31** at WH_MDL_00327237.

*Advice Concerning the Form and Role of LLCs*

62. Kaye Scholer formed (or was consulted in connection with the formation of) substantially all of the LLCs that sponsored pension plans trading in Denmark. *See* **Ex. 119** (indicating Kaye Scholer's role liaising with Vcorp to establish Rajan Investments LLC in 2012); **Ex. 120** (indicating Kaye Scholer's support to Argre in establishing six LLCs and explaining the origin of names chosen by Kaye Scholer); **Ex. 121** (indicating Kaye Scholer's role in the establishment of four trading plans in 2014); **Ex. 122** (indicating Kaye Scholer's role in the establishment of another five trading plans in 2014).

63. Peter Wells came up with the names for the LLCs established in 2014. **Ex. 146** at 59:2–60:19; **Ex. 32**.

64. The defendants will testify that Kaye Scholer knew those LLCs were going to sponsor pension plans that would participate in dividend arbitrage trading in Denmark.

65. Mr. van Merkensteijn will testify that Kaye Scholer advised on the manner in which the U.S. pension plans' sponsoring LLCs should make contributions to the plans.

66. Mr. van Merkensteijn will testify that Peter Wells advised, during a period in which certain LLCs did not yet have bank accounts, that contributions from individuals to pension plans should be booked as transfers from individuals to LLCs to pension plans.

*Advice Concerning Issues of Beneficial Ownership*

67. Defendants expect Peter Wells will testify that the issue of beneficial ownership "was an issue that was being actively discussed," and that Kaye Scholer's view was "that there was comfort making that – making that representation [that the plans were beneficial owners of the dividends]." **Ex. 146** at 31.

68. Kaye Scholer advised that the Plans could "appropriately represent, for U.S. tax purposes, that they were the beneficial owners of the shares" to the Internal Revenue Service and Federal Reserve. **Ex. 102** at 23–24, 237:5–10 ("I generally recall, in substance, communicating the view to the client group that the firm was comfortable. From a U.S. tax pension regulatory perspective, the plans were -- were the beneficial owners of the Danish securities.").

69. Prior to the Plans submitting any reclaim applications to SKAT, Ben-Jacob and Jerome Lhote had discussions regarding a Danish legal opinion and whether it was appropriate under Danish law to treat the Plans as beneficial owners of dividends. Based upon those conversations, Michael Ben-Jacob understood that such a representation was appropriate. *Id.* at 167–168, 178, 190.

*Advice Concerning U.S. Securities Filing Obligations*

70.    Kaye Scholer advised "that the ultimate decision for trading be placed in the hands of the pension plan trustees and not with Solo" due to a U.S. securities law issue. *Id.* at 113:13–20, 115:1–6.

71.    John van Merkensteijn will testify that he recalls a change in the method by which the securities trades were hedged was related to a U.S. commodities rule issue identified by counsel. Indeed, defendants' Argre colleagues engaged yet another law firm – Dechert – to advise on the issue. Dechert's advice was then forwarded to van Merkensteijn, reviewed, and used to inform the hedging component of the transaction. **Exs**. **143–144**.

*Advice Concerning Periodic Federal Reserve Filings (Treasury Forms S and SLT)*

72.    In connection with their advice on compliance with U.S. legal aspects of the transaction, Kaye Scholer advised Markowitz and van Merkensteijn with respect to a range of bank regulatory and tax compliance reporting issues, and advised on which forms would need to be filed. **Ex. 137** (April 25, 2012 email from Ben-Jacob to Markowitz explaining various Federal Reserve TIC forms, FBAR forms, and other U.S. tax compliance reporting forms considered by Kaye Scholer in connection with the ex-dividend transaction).

73.    Peter Wells provided advice regarding Treasury Form SLT. **Exs. 39** (May 31, 2015 email from Markowitz to Wells stating, "As you can see, a number of accounts are over USD 1 billion."), **40**, **146** at 137–40.

74.    Kaye Scholer was fully aware of the volume of trading and the amounts earned by the Plans through the trading. Defendants will testify that Kaye Scholer

prepared and filed periodic reports to the Federal Reserve on behalf of the Plans, which stated the volume and value of the shares the Plans traded in Denmark and other foreign jurisdictions. **Ex. 102** at 309–310; **Exs. 41**, **42** (email from Markowitz to Wells stating that all 40 Plans bought or sold securities exceeding $350 million), **43**.

*Representation in Connection with Inquiries by the Federal Reserve*

75.    Kaye Scholer responded to inquiries from the Federal Reserve of New York regarding the pension plans' securities holdings. **Ex. 44** (Dep. Ex. 3125).

*Advice Concerning U.S. FBAR Compliance Reporting*

76.    Kaye Scholer provided advice regarding FBAR reporting. **Ex. 102**  at 64–70; **Ex. 146** at 42; **Ex. 140**; *see* **Ex. 45** (email thread between Adam LaRosa, Michael Ben-Jacob, Peter Wells, and the Argre partners, discussing FBAR reporting and attaching a Solo Capital statement for Mill River Capital Management Pension Plan); **Ex. 46** (reflecting Kaye Scholer's advice that Trio and Quartet file FBARs due to ownership interests in general partnerships which had a financial interest in foreign "accounts notwithstanding that the accounts are titled in the name of the pension plans"); **Ex. 123** (email from Kaye Scholer containing advice that partnerships file FBARs).

77.    Kaye Scholer prepared and filed FBAR forms on behalf of the partnerships. **Ex. 102** at 245:24–246:2; **Ex. 124** (FBAR filing submission confirmation).

78.    In some instances, Kaye Scholer advised that FBARs be filed to comply with the spirit of the law even though there were arguments that the requisite thresholds may not have technically been met. **Ex. 146** at 45; *see* **Ex. 132** (email

from Peter Wells reflecting Kaye Scholer's advice that certain FBARs be filed where "there were no cash balances in the accounts – and therefore potentially no filing requirements if we only looked at the net position"). Defendants followed that advice.

*Advice Concerning Payments to Ganymede*

79.    Kaye Scholer was aware that the Plans entered into Reclaim Advisory Services Agreements with an entity called Ganymede, which Kaye Scholer was aware Sanjay Shah owned. **Ex. 102** at 85–87; **Ex. 145** at 32–3; **Exs. 16** (February 28, 2013 email from Matt Stein to Ben-Jacob identifying Shah's ownership interest in Ganymede)) and **17** (October 12, 2012 email from Solo, forwarded to Kaye Scholer, and attaching tax reclaim advisory services agreement "under which our Cayman entity, Ganymede Cayman Limited, will recover fees."); **Ex. 111** (Ganymede invoice sent to Kaye Scholer).

80.    Kaye Scholer was aware that the plans would be splitting trading profits with Solo in the approximate ratio of 66% to Solo, 34% to the plans, and that Solo's portion would be paid as a fee to Ganymede. **Ex. 102** at 57–58, 81–82, 89–90, 112, 149. Ben-Jacob understood that this represented a "business deal" between his clients and Solo. *Id.* at 116.

81.    On October 18, 2012, Markowitz and van Merkensteijn received an email from Michael Ben-Jacob stating: "We have reviewed the tax and compliance issues surrounding the payment due to Ganymede under the Tax Reclaim Services Advisory Agreements and summarize the conclusions below. In short we see no reason you should not make the payment subject to the few minor points

below." **Ex. 125** at WH_MDL_00219656.  The email provided the following advice:

a.  "Tax Withholding - Louis confirmed that the payment should not be subject to withholding as it should not be U.S. source (services are all being provided abroad and the fact that the payments originate from the account of a U.S. person (whether Ezra or the pensions) does not alter the analysis). We recommend that each pension/Ezra keep a W8-BEN on file." *Id.*

b.  Patriot Act- Chris Brewster (our in-house expert in this area) indicated that we should be conducting due diligence to ensure that no payment is being made to a person that is identified as being associated with international terrorism. He advised the following two things to undertake in this respect: 1. To ensure that the recipient is not on the U.S. database (located at http://export.gov/ecr/eg main 023148.asp). We have searched for Ganymede and no hits came up.  2. Each pension and Ezra should have any recipient sign a certification - in which the recipient is certifying in a form consistent with the attached that they are not associated with terrorism. Please let us know whether you will have this certification reproduced for each pension and Ezra or whether we should do it and forward along to you." *Id.*

c.  "Pension/Retirement Issue - We have spoken with Woody who confirmed there are no issues from a pension standpoint." *Id.*

d.  "FATCA- David Sausen (our in-house FACTA expert) confirmed that such payments should not be 'withholdable payments' under FATCA because

withholdable payments must be, by US tax definition, U.S. source. As a result, notwithstanding that FATCA does not come into effect until January 1, 2014, there should not be any FATCA application to this payment." *Id.*

**IV.    COMPLETE DISCLOSURE OF MATERIAL FACTS TO LAWYWERS**

82.    Defendants expect Ben-Jacob will testify that he believes the Argre principals "told [Kaye Scholer] all the relevant facts and information related to the trading. . . . I have no reason to think that they withheld any information." **Ex. 102** at 26–28.  The record at trial will demonstrate that Kaye Scholer's understanding of the Danish transaction and related information matched that of the defendants.

83.    In connection with seeking Kaye Scholer's advice on transactions involving Solo, the Argre principals shared the results of their due diligence research of Solo with Michael Ben-Jacob.  *Id.* at 103:24-104:13 ("I understood that they went to London, met with Solo representatives. I don't know with whom they met. Stayed there for a number of days. I understood -- I have a vague recollection that they had some sort of report commissioned. I can't remember the nature of the report, but some kind of -- maybe it was a -- some business report or a certain business investigator. I can't remember the details, but they had a third party investigate the bona fides of Solo and Mr. Shah. And so we relied on our clients investigation and due diligence."); *see also id.* at 104:21 – 105:13 ("Yes, I have a general recollection that they certainly reported orally to me and perhaps to others in my firm, I don't know. But certainly we had conversations to the effect that, you know, Mr. Shah appeared to be, you know, a reputable businessperson, operating a licensed and properly regulated

financial institution out of the U.K., had a pedigree of having worked with or been an executive with major -- other major financial institutions. And I believe, as I said, there was some report that I vaguely remember them obtaining that I may have seen, but I can't recall if they gave me a copy, but that ultimately concluded that Mr. Shah and Solo Capital were a bona fide and reputable financial institution.").

84.  The defendants informed Kaye Scholer that the Plans would make dividend withholding tax reclaim applications to Denmark. **Ex. 102** at 23–24.

85.  The defendants informed Kaye Scholer that "Solo provided a list of . . . suggested purchases, and that the clients – or I should say the pension plans then selected which they wanted to pursue." *Id.* at 101:8–12.

86.  The defendants informed Kaye Scholer that "Solo facilitated and made introductions to financial and other lending institutions" involved in the transactions. *Id.* at 101:15–18.

87.  The defendants informed Kaye Scholer that the Plans were entering into stock lending agreements in order to purchase Danish securities. *Id.* at 64–70; **Ex. 14** (April 18, 2012 email from Markowitz to Ben-Jacob attaching a stock lending agreement and requesting Kaye Scholer review).

88.  The defendants informed Kaye Scholer that the Plans would finance 100 percent of the purchase price of the Danish shares they bought. **Ex. 102** at 109:20–23, 110:3–5, 311:11–17, 314:3–12.

89.  Kaye Scholer received cash balance information for the Plans' accounts at Solo which shows that Danish reclaim payments were the only positive cash flows into the Plans' accounts.  *See* **Ex. 15**; **Ex. 102** at 71–74.

90.  Kaye Scholer knew that Markowitz and van Merkensteijn brought in friends and family members to "sponsor plans and to participate in the Solo trading." **Ex. 102** at 129:16–19.

91.  Kaye Scholer understood that the reclaim was for the full amount of Danish withholding tax on dividends.  *Id.* at 148:8–12.

92.  Kaye Scholer understood that the Plans would represent on reclaim applications that they were the "beneficial owner" of the shares.  *Id.* at 151:12–17.

93.  The defendants informed Kaye Scholer that the plans' trading accounts with Solo would be pooled at the custodial level.  *See* **Ex. 18** at WH_MDL_00282563 ("[H]aving accounts 'pooled' is critical to being able to have long and short client positions net out for regulatory and capital purposes.").

94.  Kaye Scholer understood that "certain specified accounts [would] be held by the Plan[s] as agent[s]/nominee[s] for [the] Partnership[s]." **Ex. 126** at KLUGMAN00059931.

95.  The Michelle Memo "outlines [Kaye Scholer's] understanding from discussions with you of the facts and set-up of the Michelle Structure and the organization of the associated structure as well as the trading activity and related operations of the structure." **Ex. 74** at JHVM_0010573.

96.    The Michelle Memo states that, "[o]n or about May 10, 2012, Michelle LLC established the Michelle Plan, which is a prototype 401(k) plan. As a prototype plan, the Michelle Plan is intended to be qualified under Section 401(a) of the Code.  We understand that the service provider that maintains this prototype plan has sought and obtained an IRS response letter regarding the tax qualified status of the form of the plan. The Members jointly act as the trustees of the Michelle Plan pursuant to a trust agreement." *Id.* at JHVM_0010574 (footnote omitted).

97.    The Michelle Memo continues: "Solo Capital Partners LLP ('Solo'), a UK based financial services firm, presented the Michelle Plan trustees with the trading strategy discussed below. Solo is authorized and regulated in the UK by the Financial Services Authority, but is not regulated by any regulatory or quasi-regulatory agency in the United States. Solo is independent of Michelle LLC, Argre, the Members, and any affiliated entity of any of them and there is no common ownership between Solo, Michelle LLC, Argre or any such entity. We understand that (i) Solo provided the entire structure of the trading strategy to the trustees and (ii) the trustees had little or no ability to negotiate the financial terms of the arrangement, which were basically the same, or more favorable to the Michelle Plan, as arrangements that existed between Solo or other providers which engage in this trading strategy and unrelated third parties who were and are engaging in similar trading activities with Solo or those other providers." *Id.* at JHVM_0010574-5.

98.    The Michelle Memo describes Solo's strategy "as follows: the Michelle Plan would enter into a custodial agreement with Solo pursuant to which (i) the Michelle Plan would transfer assets to a custodial account of which Solo was the custodian, (ii) Solo provided the Michelle Plan trustees with information about the securities of certain publicly-traded companies on certain foreign (non-U.S.) stock exchanges, (iii) on or before the ex-dividend date for such shares, the Michelle Plan would direct Solo to purchase shares of some or all of the companies presented by Solo, (iv) Solo would guarantee the Michelle Plan's trades vis-a-vis a third-party broker, allowing the Michelle Plan to make highly leveraged trades, (v) the purchased shares would be held in the custodial account, (vi) the Michelle Plan would take a short futures position in shares of such company by selling to an unrelated third party a cash-settled single stock future, which would not expire until at least one day after the dividend record date of the purchased shares, (vii) on behalf of the Michelle Plan, a third party would submit a tax reclamation request to the appropriate authorities with respect to the gross dividend amount previously withheld on the sale by such authorities, (viii) the Michelle Plan would receive a payment equal to the net dividend amount of the shares it held, (ix) the Michelle Plan would cause Solo to sell the shares it holds in the market and settle the futures contract for cash, and (x) the Michelle Plan would remit a specified percentage of the net dividend amount to Solo (which would then pay significant fees and expenses incurred in the transactions described above which fees are separate from third party professional and other fees paid by the Michelle Plan related to such

transactions.) The purpose of the short futures position was to hedge against loss of principal in order to minimize or eliminate the economic risk of holding the shares. The Michelle Plan simultaneously entered into a securities lending agreement with a third party under which it lent securities in exchange for cash. We understand that (a) the securities lending arrangements embodied in a number of documents are typical of those entered into by organizations in the United Kingdom and comply with United States securities lending regulations, (b) the purpose of this arrangement was to generate the necessary liquidity to implement the trades, and (c) investing in this arrangement does not guarantee payments to Solo or indemnify Solo, and no payments or other benefits were received by the Michelle Plan, Michelle LLC, the Members or their affiliates." *Id.* at JHVM_0010574-6 (footnote omitted).

99.    "[O]f the gross amount payable to the Michelle Plan, the Michelle Plan retained approximately 34% and the remaining 66% was paid to Solo. Solo was responsible for paying significant costs and expenses associated with the transaction, including trading commissions, legal fees, brokerage fees, accounting fees, tax reclaim service fees, custodial service fees, leverage providing fees and guaranty fees. Solo does not break down its expenses so that investors such as the Michelle Plan are not provided with a breakout of what portion of the 66% is compensation to Solo and its affiliates and what portion pays for expenses paid to other third party service providers. The Michelle Plan paid its own fees for third party services (legal, accounting, etc.) related to the transaction. While the documents provide that the 66% paid to Solo is a 'fee' to

Solo, the understanding of the parties at the time the transaction was entered into was that Solo and the Michelle Plan were instead effectively engaged in a partnership under which the profits would be shared between them under the above profit allocation, with Solo being responsible for all of the partnership's expenses." *Id.* at JHVM_0010577.

100.    Billing records from between 2011 and 2015 reveal that attorneys from Kaye Scholer regularly communicated directly with representatives of Solo and affiliated entities in connection with the ex-dividend transactions, including:

a.    February 9, 2011, telephone call between Ben-Jacob, Woodard, Tuchman, and Solo, **Ex. 21** at WH_MDL_00355038;

b.    October 31, 2011, telephone call "with Solo regarding interpretation of cash account statements," **Ex. 22** at WH_MDL_00355175;

c.    December 9, 2011, correspondence between Peter Wells and Solo "re follow-up issues related to reclaims," **Ex. 22** at WH_MDL_00355178;

d.    March 9, 2012, email from Peter Wells to Sanjay Shah and others requesting statements for Ezra's security trading account. **Ex. 127** at WH_MDL_00462802;

e.    May 10, 2012, telephone call between Ben-Jacob, Solo, and German counsel "re: response to German Tax Authority questions," **Ex. 22** at WH_MDL_00355181;

f.    June 13, 2012, email from Michael Ben-Jacob to Sanjay Shah and others stating that Kaye Scholer reviewed advice provided by Norton Rose and

expected a reply later that day to some questions raised by Norton Rose. **Ex. 128** at WH_MDL_00285163.

g.  June 20, 2012 correspondence between Ben-Jacob and Solo related to "letter re: German Tax re: claim," **Ex. 22** at WH_MDL_00355185;

h.  December 17, 2012, conference call between Ben-Jacob, Argre and Solo, **Ex. 22** at WH_MDL_00355195;

i.  February 23, 2014, telephone call between Peter Wells and Solo regarding "trading matters," **Ex. 23** at WH_MDL_00355707;

j.  July 29, 2014, telephone calls between Peter Wells and Old Park Lane, **Ex. 5** at WH_MDL_00355454;

k.  August 6, 2014, telephone call between Peter Wells and Old Park Lane, *Id.* at WH_MDL_00355458;

l.  October 9, 2014, telephone call between Peter Wells and Old Park Lane regarding "matters related to new plans," *Id.* at WH_MDL_00355465;

m.   October 29, 2014, meeting between Peter Wells and Old Park Lane, *Id.* at WH_MDL_00355467;

n.  November 26, 2014, telephone call between Peter Wells and Old Park Lane regarding "on-boarding matters," *Id.* at WH_MDL_00355472;

o.  February 23, 2015, telephone call between Peter Wells and Solo regarding "trading matters," *Id.* at WH_MDL_00355514; and

p.  April 8, 2015, telephone call between Peter Wells and Solo regarding "reclaim matters," *Id.* at WH_MDL_00355566.

## V.   ADVICE CONCERNING PREDECESSOR DIVIDEND ARBITRAGE TRANSACTIONS

### A.    The Broadgate Fund

101.    Defendants will testify that in the lead-up to Argre's first dividend arbitrage transaction in 2010, involving German stock, Argre sought and received extensive legal assistance.  The individual defendants will testify that they retained Crowell & Moring in the United States and Arthur Cox in Ireland.  Through Solo Capital, which arranged the Broadgate fund, the individual defendants also received advice from Norton Rose on German tax issues.

102.    The individual defendants will testify that Arthur Cox was retained on April 8, 2010 to provide legal advice on the proposed investment with the Broadgate Fund.  **Ex. 138**.

103.    The individual defendants will testify that Crowell & Moring reviewed the fund prospectus and investment management agreement.

104.    Arthur Cox participated in the due diligence Argre Management conducted of the Broadgate Fund in April 2010, including discussions with the Fund's Irish Counsel.  **Ex. 47** (copy of due diligence questions from Argre Management reflecting April 12, 2010 discussion).

105.    The Broadgate fund conducted dividend arbitrage transactions in German securities.  Before participating in the transaction, the defendants received a detailed draft opinion letter from the international law firm Norton Rose.  **Ex. 48**.  The opinion letter, drafted by German partner Marin Krause, laid out in detail the structure of the dividend arbitrage transactions, describing the purchase of shares in German companies as well as offsetting short future positions.  *Id.* at WH_MDL_00356118.  The letter opined that the transactions

worked as a matter of German tax law, including that the Fund "should be entitled to a partial refund of German withholding tax" and "should not be disregarded by application of the anti-avoidance rule." *Id.* at WH_MDL_00356119. That opinion letter was updated multiple times, *see, e.g.,* **Exs. 49**, **50**, but the bottom-line opinion did not change. Mr. Markowitz recalls learning that it was finalized (with the favorable opinion intact) by Norton Rose before the Broadgate transaction commenced.

106. Between September 2, 2010 and December 3, 2010, Todd Rosenberg and Noah Bloomberg at Crowell & Moring provided, via email, extensive advice and draft language for a memorandum of understanding with Solo Capital on the equity arbitrage agreement. **Exs. 36, 51**–**68**. Many of these emails reflect input and changes made after calls with the Argre investors and individuals from Solo Capital. **Ex. 57** (a September 21, 2010 email from Todd Rosenberg to Richard Markowitz).

107. On December 6, 2010, Noah Bloomberg at Crowell & Moring circulated to Richard Markowitz, Robert Klugman, Sanjay Shah, and Raj Shah a fully executed version of the memorandum of understanding, dated December 3, 2010. **Ex. 69**.

**B.    Ezra Academy**

108. Following the Broadgate investment, Markowitz and van Merkensteijn pursued a second dividend arbitrage opportunity with Solo, this time with the advice of Kaye Scholer. This opportunity involved a non-profit entity, the Ezra Academy ("Ezra"), trading German securities (the "Ezra transaction").

- 36 -

109. Kaye Scholer provided legal services to the participating individual defendants in connection with what became the Ezra transaction beginning no later than March 2010. **Ex. 21** at WH_MDL_00355011–12.

110. Ezra was, at the time, another client of Kaye Scholer, and one of multiple potential participants in the transaction identified by Michael Ben-Jacob, who then introduced these potential participants to Argre. **Ex. 102** at 36; **Ex. 22** at WH_MDL_00355138 (billing entries by Michael Ben-Jacob on March 15 and 16, 2011, including "calls with various charities to explain opportunity"); *id.* at WH_MDL_00355140 (billing entries by Michael Ben-Jacob on March 23 and 25, 2011, including meetings with charitable organizations); **Ex. 129** at WH_MDL_00363906 (April 17, 2014 e-mail from Michael Ben-Jacob responsive to questions presented by a money-laundering officer, indicating that Ben-Jacob knew "Ezra for 25 years and they have been a client of the firm for about 4 years").

111. Mr. van Merkensteijn will testify that, regarding the Ezra transaction, Argre "discussed everything with Kaye Scholer."

112. Kaye Scholer's advice extended to assisting the Argre principals and Solo Capital with identifying a structure through which to execute the transaction. On February 9, 2011, lawyers from Kaye Scholer (including Ben-Jacob and Lewis Tuchman) joined a conference call with the Argre principals and Sanjay Shah, Raj Shah, and Guenther Grant-Klar of Solo Capital to discuss different possible structures "that could involve a US charity or a US pension fund." **Ex. 70** at WH_MDL_00275757.

113.    On March 16, 2011, Richard Markowitz sent Kaye Scholer lawyers Michael

Ben-Jacob, Louis Tuchman, and Peter Wells "a diagram for the major aspects

of the transaction" that "Solo Capital ha[d] reviewed[.]" **Ex. 71** at

WH_MDL_00276116.  That diagram depicted the following structure to the

proposed transaction:

### STRUCTURE OF TRANSACTION



114.    The following day, on March 17, 2011, Richard Markowitz sent Michael Ben-

Jacob an email with the subject line "Detailed steps of a Transaction," and

attaching a "document that ha[d] been prepared by . . . Solo Capital [. . .]

giv[ing] the details for one of the trades, including the fact that the positions are

fully hedged and that they are unwound for the same settlement day." **Ex. 72**

at WH_MDL_00276138.

115.    Using a fifteen-step sample transaction, the document traced the life cycle and

anticipated cash flows of a proposed dividend arbitrage transaction involving

Daimer AG as follows:

a. "April 13ᵗʰ – Daimler AG has declared a gross dividend of Eur1.85 per share (Eur 1.3620625 net).  Through an interdealer broker (IDB), Solo Capital Limited (Solo) would place a buy order for 9,700,000 Daimler shares at Eur 45.28 per share, with settlement date 15ᵗʰ April. Notional of the trade is 439,216,000 EUR.

b. "April 13ᵗʰ – Through an IDB, solo would place a sell order for 97,000 Daimler single stock Liffe futures (multiplier 100) expire on April 15ᵗʰ (April 2011 expiry), at Eur 43.80 per share (80% of the dividend). The futures would be cash settled. The futures price is calculated as Eur45.28 share price less Eur1.48 dividend (80%). Please note that in order to simplify the calculation we have assumed that interest rates are 0% and that the share price stays at Eur45.28.

c. "April 13ᵗʰ – Assuming the IDBs can find liquidity for the orders, the equity would be given up to the Foundation's custody account while the futures would be given up to the Foundation's future account.

d. "April 13ᵗʰ – The Foundation pays brokerage commission of Eur5,490 for the equity order (1/8ᵗʰ bp).

e. "April 14ᵗʰ (ex-date) – The initial margin is calculated on the future position, for this trade it is Eur39,846,994 (439,216,000*9.072%). This cash amount needs to be posted to the clearers account.

f. "April 14ᵗʰ – The Foundation, as the beneficial owner of the shares on the record date, receives a compensation payment from the custodian, equal to the net dividend amount of Eur13,212,006.

- 39 -

g.  "April 14th – Through the IDB, Solo will place a sell order for 9,700,000 Daimler shares at Eur45.28 for settlement date 15th April.

h.  "April 14th – Through the IDB, Solo will place a buy order for 97,000 Daimler April 2011 expiry futures at a price of Eur45.28.

i.  "Assuming the IDBs can find liquidity for the orders, the equity would be given up to the Foundation's custody account while the future trades would be given up to the Foundation's future account.

j.  "April 14th – The Foundation pays brokerage commission of Eur5,490 for the future order (1/8th bp).

k.  "April 14th – On behalf of the Foundation, Acupay would file a tax reclaim with the Federal Tax Office, in the amount of Eur4,732,994, which is 26.375% of the gross dividend.  The fund pays Eur7,185 fee for the reclaim.

l.  "April 15th – Close out of the cash future settles, amount Eur14,356,000 ((45.28-43.8) * 9,700,000) is transferred from the Foundations account to the Liffe Exchange.

m.  "April 15th – Liffe exchange returns the initial margin to the Foundation, Eur39,846,994.

n.  "April 15th – The purchased shares settle versus Eur439,216,000 and they are then delivered out versus Eur439,216,000. This ensures that the Foundation has no open positions in the security.

o.  "July 11th – Approximately after 3 months, through Acupay, the Foundations should receive the reclaim." **Ex. 73** at WH_MDL_00276140.

- 40 -

116.    On March 21, 2011, Richard Markowitz sent Michael Ben-Jacob and Louis
        Tuchman a draft German tax legal opinion regarding dividend arbitrage
        prepared by Norton Rose (the "Norton Rose Opinion"). **Ex. 75**. That draft
        opinion described a transaction that closely resembled the transaction that Solo
        had presented (as described above). It concluded that the U.S. non-profit
        purchaser of the German shares would acquire "true/beneficial/economic
        ownership" on the trade date, and "should be entitled to a full refund of
        withholding tax." *Id*. at WH_MDL_00276172.

117.    Kaye Scholer attorneys in the U.S. and Germany analyzed the Norton Rose
        Opinion, *see* **Ex. 22** at WH_MDL_00355145 (April 7, 2011 billing entry by
        Frank Geyer noting a call with Louis Tuchman, Gottfried Freier, and Martin
        Weger "re the legal structure of the transaction and the content of the Legal
        Opinion delivered by Norton Rose"); *id.* at WH_MDL_00355158 (May 2, 2011
        billing entry by Thomas Jesch stating: "Norton Rose Opinion (Final
        Analysis)"); *id.* at WH_MDL_00355159 (May 3, 2011 billing entry by Martin
        Weger stating: "Review German tax opinion (Norton Rose)"), and further
        consulted with Norton Rose directly on the content of the opinion. *See id.* at
        WH_MDL_00355147 (April 8, 2011 billing entry indicating a telephone call
        between Martin Weger from Kaye Scholer and Martin Krause of Norton Rose's
        Frankfurt office); *id.* (April 11, 2011 billing entry indicating Louis Tuchman
        participated in a conference call with Norton Rose); *id.* at
        WH_MDL_00355148 (April 11, 2011 telephone call between Weger and

Krause); *id.* at WH_MDL_00355154 (April 28, 2011 billing entry indicating Peter Wells participated in a conference call with Norton Rose).

118.  In connection with the Ezra transaction, U.S.-based Kaye Scholer attorneys conferred with German counsel. *See id.* at WH_MDL_00355139–140 (March 17 and 18, 2011, billing entries by Peter Wells indicating calls with German counsel); *id.* at WH_MDL_00355185 (June 6, 2012 billing entry by Michael Ben-Jacob stating: "Review Norton Rose comments on letter to German authorities.").

119.  Among other issues, Kaye Scholer attorneys analyzed and advised the Argre principals with respect to German tax law on short sales and ownership. *See id.* at WH_MDL_00355149 (April 14, 2011 billing entry by Thomas Jesch stating: "[Solo Capital Ltd.] Analysis Short Sale Structure / Allocation of Ownership under Sec. 39 of the German General Tax Code) (brackets in original); *id.* at WH_MDL_00355150 (April 15, 2011 billing entry by Thomas Jesch stating: "[Solo Capital Ltd.] Further Analysis re Short Sale Structure / Withholding Tax Refund") (brackets in original); *id.* at WH_MDL_00355153–54 (April 28, 2011 billing entry by Thomas Jesch stating: "[Solo Capital Ltd.] Translation of BMF Circular re Short Sales around Dividend Distribution Date / Withholding Tax Refund.") (brackets in original).

120.  An April 2011 Kaye Scholer memorandum addresses "certain U.S. federal income tax consequences" of a "German share transaction."  Based upon versions of the agreements that would come to underpin the Ezra transaction, Kaye Scholer described the German share transaction as involving a charity

purchasing shares "on or before the dividend record date"; selling cash-settled single stock futures, which would not expire until at least one day after the dividend record date; receiving "a compensation payment from the Custodian equal to the net dividend amount"; then, after a tax reclaim was filed with the German tax authority, unwinding the transaction by selling "shares in the market" and settling the futures contract. **Ex. 77** at WH_MDL_00368406.

121.    Mr. van Merkensteijn will testify that Kaye Scholer ultimately organized the structure that permitted Argre to invest in the dividend arbitrage strategy with Ezra serving as a qualified entity under the double-taxation treaty between the United States and Germany.

122.    On April 22, 2011, Michael Ben-Jacob sent an email to Richard Markowitz, and Sanjay Shah, Raj Shah, Guenther Grant-Klar, and Jas Bains of Solo Capital, among others, stating: "Further to our conversation a moment ago, the following is a list of the documents that we are preparing and expect to circulate shortly[.]"  Mr. Ben-Jacob listed the following documents: (1) a "Notional Principal Contract (swap) – between Lyford and Ezra Academy"; (2) an "Investment Management Agreement – between Ezra Academy and Solo"; (3) a "Letter Agreement – between Lyford and Sanjay Shah regarding investment advisory fees to be paid by Lyford to Sanjay"; (4) an "Indemnification Agreement – indemnifying Ezra Academy in respect of all claims or proceedings which may arise as a result of the transaction"; (5) a "Supplement to Indemnification Agreement – whereby all parties (except Solo) indemnify Ezra Academy for any investment management fees due to Solo under the

investment management agreement and all parties (including Solo) indemnify Ezra Academy in respect of any costs/liabilities incurred via trading within the DB account if, for example, there is a fee imposed if the transaction doesn't go forward or if a trade order if placed and later cancelled"; (6) a "Resolution of Solo – whereby Solo determines to appoint me as sole signatory over the Solo MF Global and Solo HSBC accounts and coordinate with MF Global and HSBC to institute the safeguards set forth in the resolution"; (7) a "Nominee Agreement – between Lyford and Solo whereby Lyford appoints Solo as its nominee to conduct trades within the Solo MF Global and HSBC accounts on behalf of Lyford and which appoints me as agent on behalf of Lyford to be sole signatory over such accounts on behalf of Lyford"; and, (8) a "Personal Indemnification by Sanjay Shah – whereby Sanjay provides a personal indemnification for any damage, cost, expense, etc. resulting from any action taken by Solo, himself, Guenther, Raj, Jas or any other officer, director, agent, assignee, etc. of Solo inconsistent with the above referenced Resolution and Nominee Agreement." **Ex. 78** at WH_MDL_00364013-4.

123.    In response to a German inquiry following the Ezra transaction, Michael Ben-Jacob engaged directly with Shah and Solo to provide answers to questions. **Ex. 130** at WH_MDL_00462661 (May 3, 2012 email from Ben-Jacob to Shah, transmitting, "[f]urther to our conversation this morning, . . . responses from Ezra that I can provide at the moment. Let me know if these should be modified in any way.").

- 44 -

124.     In 2012, Kaye Scholer continued to advise Argre regarding the Ezra transaction. **Ex. 131** (June 18, 2012 e-mail from Ben-Jacob indicating that he would re-execute tax-related documents "and circulate on behalf of Ezra"); **Ex. 133** (May 2, 2012 e-mail from Ben-Jacob to Markowitz providing answers from Ezra to an inquiry from German authorities). Ben-Jacob also continued to seek assistance from Kaye Scholer counsel based in Germany regarding tax implications for Ezra in late 2012. **Ex. 134** (December 31, 2012 e-mail from Ben-Jacob to Thomas Jesch regarding a proposed response to German authorities' questionnaire regarding German trades conducted by Argre and Ezra).

125.     In connection with the Ezra transaction, Kaye Scholer billed Argre $359,650.03 for work performed between April 2011 and August 2013. **Ex. 22** at WH_MDL_00355136.

**C.**    <u>Trading In Belgium</u>

126.     In early 2012, Richard Markowitz and John van Merkensteijn explored the possibility of participating in dividend arbitrage transactions involving Belgian securities. Initially, they were in discussions with an international alternative investment group called Duet Asset Management ("Duet"). As with the Broadgate transaction, it was critical to the investors that they receive advice from local counsel. In a March 9, 2012 email, Markowitz told van Merkensteijn, "Regarding a tax opinion from Freshfields . . . I told Rob that we wanted to at least have some conversations with the lawyers as a start, so that we had comfort on the basics of the structure." **Ex. 79**.

127.     On March 12, 2012, the investors spoke to Belgian counsel at Freshfields, who shared the form of certification that a tax-exempt entity would have to provide

in order to seek a refund of withheld dividend tax from the Belgian tax authority.  *See* **Ex. 83** (calendar invitation); **Ex. 84** (email from Markowitz referencing the call with counsel); **Ex. 85** (email from Robert Neyt of Freshfields to Markowitz, van Merkensteijn, and Klugman).  Markowitz forwarded the message from Freshfields to Michael Ben-Jacob at Kaye Scholer.  **Ex. 86**.  Meanwhile, that same day, Michael Ben-Jacob reviewed a "Duet presentation regarding ex-dividend transactions."  **Ex. 80** at WH_MDL_00355209.

128.    On March 15, 2012, the investors received an update from their business partners at Duet in Belgium.  The update forwarded advice from Freshfields regarding whether a U.S. pension plan would be eligible to receive gross dividends on Belgian equities both "under Belgium domestic law and also the US / Belgium treaty."  **Ex. 87** at WH_MDL_458969.  In response, Markowitz wrote, "We have forwarded your email to our lawyers and, in the future, please include them on emails to us.  Thank you.  As I mentioned, his name is Michael Ben-Jacob . . . ."  **Ex. 88** at WH_MDL_00458977.  Markowitz continued, "we still have some outstanding questions on the Dutch tax analysis (based on some conversations we have had with other tax advisors in the Netherlands)."  *Id.*

129.    On March 21, 2012, Markowitz emailed again to request that Freshfields evaluate the possibility of using a total return swap [TRS], and also "would like Freshfields to consider having the TRS be at the partnership level."  **Ex. 89**.  The next day, the investors received additional advice from Freshfields, which reported that they "would also be able to provide an opinion confirming that

under the terms of the US / Belgium treaty, in their view, an IRA investing through a transparent partnership would be able to get the benefits under the Dividend Article and be able to confirm that it is the beneficial owner of the Belgian shares." **Ex. 90** at KLUGMAN00065015.

130.    The investors received a draft tax opinion from Freshfields. **Ex. 91**. The opinion included an eleven paragraph "Description of the Transaction," including the explanation that a partnership would "undertake a delta one market neutral trading strategy over Belgian shares" in which the partnership would "acquire[] and hold[] listed Belgian shares," "hedge its share positions by way of derivative instruments" which would "always be cash settled," involve counterparties not resident in Belgium, "seek leverage from a third party bank," and "hedge its exposure via a forward contract under which a third party will provide funding to the Partnership." Freshfields opined that "the Pension Plan should be entitled to benefit from the withholding tax exemption provided for under article 10.4 b) of the Treaty for dividends made payable by Belgian Issuers . . . the Pension Plan should in this respect qualify as the beneficial owner of these dividends . . . ." *Id.* at WH_MDL_00281235-6.

131.    On April 13, 2012, Markowitz offered his business partners a series of reactions, noting that "we have not had a chance to review these with Kaye Scholer," but would be receiving comments from US counsel shortly. Markowitz asked whether the "specifics of the trades" and the "specific details" have "been shared with Freshfields," and "if so, they should be included." He went on, "We would like to see a discussion by Freshfields that, even if the

payment received is in the form of a compensation payment or manufactured dividend (from the seller of the shares), the Pension Plan is the recipient of the dividend under Belgian tax law and for purposes of the DTT [Double Taxation Treaty]." **Ex. 92**.

132. On April 15, 2012, Michael Ben-Jacob shared his comments on the Freshfields draft opinion. **Ex. 93**.

133. At around the same time, Solo reached out to the investors to raise the possibility of participating in a dividend arbitrage trade relating to Belgian securities. It remained important to the investors that they obtain Freshfields' advice about the potential transactions Solo was proposing. On April 18, 2012, Markowitz emailed Axel Haelterman of Freshfields to ask if they had time to discuss the Solo transactions. **Ex. 94**.

134. On April 20, 2012, Freshfields asked Markowitz for additional information about Argre Management LLC in order to comply with anti-money laundering regulations so that Argre could become a client of Freshfields. **Ex. 95**.

135. On April 23, 2012, Freshfields circulated a draft memorandum which noted some potential tax risks with the transaction in the event the shares used in the dividend arbitrage strategy were purchased from a short seller. **Ex. 94** (specifically addressing risks associated with two international central securities depositories: Euroclear and Clearstream) . Mr. Haelterman explained that "a relevant number of short sellers in the market makes the legal basis for invoking a dividend withholding tax exemption somewhat doubtful." *Id.* He

cautioned, "the tax risk is for the buyer." *Id.*  The email was forwarded to Ben-Jacob.  **Ex. 96**.

136.    In response to this message, the investors scheduled a call with Mr. Haelterman for April 27, 2012.  Documents indicate that this call was between Mr. Haelterman and two members of the Argre group who were considering the Belgian transactions, Jerome Lhote and Matthew Stein, both of whom are trained as tax lawyers.  **Ex. 97**.  On April 29, 2012, Mr. Lhote wrote to Mr. Haelterman, copying Mr. Markowitz, Mr. van Merkensteijn and others, provided "a description of the facts for our clients who are considering to acquire Belgian shares paying dividends," and requested an opinion for each entity, the first of which was a pension plan.  **Ex. 98** at WH_MDL_00462484.

137.    On May 2, 2012, Freshfields provided a draft opinion, requesting additional information from the investors.  **Ex. 99**.  As before, the draft opinion concluded that "the Pension Plan should be entitled to benefit from the withholding tax exemption provided for under article 10.4 b) of the Treaty for dividends made payable by Belgian Issuers," and "should in this respect qualify as the beneficial owner of these dividends."  **Ex. 100** at WH_MDL_00462606.  The draft opinion did not express any concerns that purchasing from a short seller would undermine the tax treatment of the transaction.  The draft opinion was forwarded to Ben-Jacob, **Ex. 101**, who provided edits by hand.  **Ex. 24**.

138.    On May 15, 2012, the investors provided additional information to Freshfields, including partnership agreements, IRS tax forms, forward contracts, and other information Freshfields had requested.  **Ex. 103**.

139. On May 18, 2012, Ben-Jacob provided line edits on the Freshfields opinion letters. **Exs. 104**, **105** (mark-up).  On May 21, 2012, Ben-Jacob's markups were forwarded to Freshfields.  **Ex. 106**.

140. Freshfields also provided Markowitz with an 80-page presentation entitled "Dividend taxation for cross-border transactions:  a multi-jurisdictional review with case studies."  **Ex. 107**.

141. On November 30, 2012, Duet provided a different draft tax opinion from Freshfields. **Ex. 108**.  As with its previous opinions, Freshfields advised that the pension plan "should be entitled to benefit from the withholding tax exemption provided for under article 10.4 b) of the Treaty" and "should in this respect qualify as the beneficial owner of these dividends."  **Ex. 109** at WH_MDL_00288884.

142. On December 2, 2012, Ben-Jacob advised Markowitz that he had reviewed the opinion and had no further comments. **Ex. 110**; *see* **Ex. 81** at WH_MDL_00355370 (December 2, 2012 billing entry by Michael Ben-Jacob noting his review of "draft opinion from Belgian counsel").

143. On December 19, 2012, Duet provided Markowitz, van Merkensteijn, and Klugman a signed opinion letter from Freshfields.  **Ex. 76**.  The opinion—which described a transaction that would be consummated with Duet through a partnership with a United States pension plan—concluded that the pension plan "should be entitled to the benefit from the withholding tax exemption provided for under article 10.4 b) of the Treaty for dividends," and that the "Pension Plan should in this respect qualify as the beneficial owner of these dividends."  **Ex.**

**139** at KLUGMAN00061664.  Markowitz forwarded the opinion to Ben-Jacob. **Ex. 112**.

144.    Markowitz, van Merkensteijn, and Klugman continued to have discussions with Freshfields into 2013.  **Ex. 113** (reflecting call); **Ex. 114** (reflecting advice from Freshfields regarding scope of exemption for foreign pension funds).  By March 11, 2013, Markowitz advised Ben-Jacob that "once again we are trying a deal with Duet," and proposed a call to discuss action items, noting that an Investment Management Agreement would be negotiable with Duet. **Ex. 115**. Meanwhile, Freshfields continued to provide advice about beneficial ownership, explaining that "the fact that the holder of the shares would have sought external funding (leverage) for acquiring the shares, should not impact on its ability to claim the withholding tax exemption," and advising on the benefits of utilizing cash settled futures rather than physically settled futures. **Ex. 116**.  Upon reviewing the advice, Markowitz responded to his Argre partners that "we need to communicate with Duet that they only use cash settled futures." **Ex. 117** at WH_MDL_00474384.

145.    On April 2, 2013, Markowitz forwarded to Duet edits to the Investment Management Agreement and asked for confirmation that there were no relevant disclosure requirements under Belgian law.  **Ex. 118**.  Duet responded to provide Freshfields' analysis regarding disclosure thresholds. *Id.*

146.    Between March 2012 and April 2013, attorneys from Kaye Scholer communicated directly with representatives of Duet on numerous occasions, including:

a. March 16, 2012, **Ex. 80** at WH_MDL_00355210 (billing entry indicating "further calls and follow-up with Duet group" by Ben-Jacob);

b. March 23, 2012, *id.* at WH_MDL_00355211 (indicating Ben-Jacob "call with Duet");

c. March 29, 2012, *id.* at WH_MDL_00355212 (indicating Ben-Jacob "attend[ed] call with Duet Group");

d. April 3, 2012, *id.* at WH_MDL_00355218 (noting Ben-Jacob "[c]all with Duet Group.");

e. April 5, 2012, *id.* at WH_MDL_00355219 (noting Ben-Jacob "telephone conference with Duet Group.");

f. April 12, 2012, *id.* (noting "calls with Rich and Duet.");

g. April 16, 2012, *id.* at WH_MDL_00355220 (noting a "[c]all with Duet");

h. November 25 and 30, 2012, **Ex. 81** at WH_MDL_00355367 (noting calls with Duet);

i. December 3, 2012, *id.* at WH_MDL_00355370 (noting Peter Wells call with Duet);

j. March 15, 2013, **Ex. 82** at WH_MDL_00355389 (noting Peter Wells call with Duet);

k. March 27, 2013, *id.* at WH_MDL_00355390 (noting call between Peter Wells, George Williams, and Duet); and

l. April 17, 2013, *id.* at WH_MDL_00355395 (noting a call between Michael Ben-Jacob, Peter Wells, and Duet).

147.    Michael Ben-Jacob was aware that Duet provided similar services to Solo.  **Ex. 102** at 98–100.

148.    Michael Ben-Jacob was aware that Duet's fees were "70 or 75 percent of the profits from the transactions," which was equal to or more than Solo's fees. *Id.*

149.    In connection with Argre's discussions with Duet regarding contemplated dividend arbitrage transactions, Kaye Scholer billed Argre $184,284.98 for work performed between March 2012 and June 2013.  **Ex. 80** at WH_MDL_00355207;  **Ex. 81** at WH_MDL_00355365;  **Ex. 82** at WH_MDL_00355388.


Dated: New York, New York
September 26, 2024

Respectfully submitted,


/s/ *Peter G. Neiman*
Boyd M. Johnson
Peter G. Neiman
Alan E. Schoenfeld
WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800
Boyd.Johnson@wilmerhale.com
Peter.Neiman@wilmerhale.com
Alan.Schoenfeld@wilmerhale.com

Andrew S. Dulberg
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6352
Andrew.Dulberg@wilmerhale.com

- 53 -

*Attorneys for Richard Markowitz, Jocelyn Markowitz, Avanix Management LLC Roth 401(K) Plan, Batavia Capital Pension Plan, Calypso Investments Pension Plan, Cavus Systems LLC Roth 401(K) Plan, Hadron Industries LLC Roth 401(K) Plan, RJM Capital Pension Plan, RJM Capital Pension Plan Trust, Routt Capital Pension Plan, Routt Capital Trust*

/s/ *Sharon L. McCarthy*
Sharon L. McCarthy
KOSTELANETZ LLP
7 World Trade Center
250 Greenwich Street
34th Floor
New York, NY 10007
(212) 808-8100
smccarthy@kostelanetz.com

Nicholas S. Bahnsen
Daniel C. Davidson
KOSTELANETZ LLP
601 New Jersey Avenue, NW
Suite 260
Washington, DC 20001
(202) 875-8000
nbahnsen@kostelanetz.com
ddavidson@kostelanetz.com

*Attorneys for Defendants John van Merkensteijn, III, Elizabeth van Merkensteijn, Azalea Pensión Plan, Basalt Ventures LLC Roth 401(K) Plan, Bernina Pension Plan, Bernina Pension Plan Trust, Michelle Investments Pension Plan, Omineca Pension Plan, Omineca Trust, Remece Investments LLC Pension Plan, Starfish Capital Management LLC Roth 401(K) Plan, Tarvos Pension Plan, Voojo Productions LLC Roth 401(K) Plan, Xiphias LLC Pension Plan*

- 54 -

### CERTIFICATE OF SERVICE

I hereby certify that on September 26, 2024 the foregoing document was served electronically to all parties of record by the CM/ECF system.


*/s/ Sharon L. McCarthy*
Sharon L. McCarthy

September 26, 2024